A.W. POYZER and Bonita Poyzer, Plaintiffs and Appellees,

v.

The AMENIA SEED AND GRAIN COMPANY, a North Dakota Corporation, Defendant,

and

Cargill Incorporated, a Delaware Corporation, Defendant and Appellant.

Myrtle H. POYZER, Plaintiff and Appellee,

v.

The AMENIA SEED AND GRAIN COMPANY, a North Dakota Corporation, Defendant,

and

Cargill Incorporated, a Delaware Corporation, Defendant and Appellant.

Civil Nos. 11412, 11413.

Supreme Court of North Dakota.

June 30, 1987.

Nilles, Hansen & Davies, Fargo, for plaintiffs and appellees; argued by Daniel J. Crothers.

Daniel L. Wentz, Fargo, for defendant and appellant.

LEVINE, Justice.

Cargill, Incorporated [Cargill], appeals from judgments foreclosing real estate mortgages given by Amenia Seed and Grain Company [ASGC] to A.W. and Bonita Poyzer and to Myrtle Poyzer. We affirm.

The facts relevant to this appeal are set out in an earlier appeal, *Poyzer v. Amenia Seed and Grain Co.*, 381 N.W.2d 192 (N.D. 1986), and will not be repeated here. In the previous appeal, we held that the security agreement between Cargill and ASGC constituted a valid real estate mortgage and that genuine issues of material fact existed regarding whether the Poyzers were bona fide encumbrancers without actual or constructive notice of the prior unrecorded ASGC–Cargill mortgage. Accordingly, we remanded for trial on the issue of whether A.W., Bonita, and Myrtle were "bona fide encumbrancers without notice" of Cargill's mortgage.

After a bench trial on remand, the trial court ruled that the Poyzers' mortgages had priority over Cargill's mortgage. The trial court found that Cargill agreed to subordinate its lien on ASGC's land to any lender taking a mortgage on that real estate; that A.W. had knowledge of the March 16, 1981, agreement between ASGC and Cargill; that Bonita and Myrtle were innocent purchasers in good faith without knowledge of Cargill's interest; and that Cargill's title, purchased at the sheriff's sale, merged with its mortgage. Cargill appealed.

Cargill first argues that the only issue properly before the trial court on remand was whether the Poyzers were bona fide encumbrancers without notice. We disagree.

In *Nodland v. Nokota Co.*, 314 N.W.2d 89 (N.D.1981), we held that an issue not considered or resolved in a prior appeal is not barred by the doctrine of res judicata. We said that the doctrine of res judicata is not applicable to issues and facts not considered or decided in prior proceedings. We noted that a trial court finding which is not passed upon by an appellate court because it is not necessary for the appellate court's decision does not render that finding res judicata between the parties. Similarly, the law of the case doctrine is based upon res judicata and also necessarily applies to issues actually decided. *Muhlhauser v. Becker*, 74 N.D. 103, 20 N.W.2d 353 (1945). If an appellate court has passed on a legal question and remanded the case for further proceedings, that decided legal

question becomes the law of the case. *Perron v. Royal Oak School District Board of Education,* 155 Mich.App. 759, 400 N.W.2d 709 (1986). Where a summary judgment is reversed and the case is remanded for trial because issues of material fact exist, the law of the case doctrine does not apply to those issues not decided on the merits. *Borkus v. Michigan National Bank,* 117 Mich.App. 662, 324 N.W.2d 123 (1982).

■ In this case, the Poyzers' complaints raised issues regarding the priority of their mortgages and Cargill's mortgage. The previous appeal addressed only whether Cargill had a valid real estate mortgage and whether, as a matter of law, the Poyzers were good faith encumbrancers without notice. We held as a matter of law that Cargill had a real estate mortgage and remanded for trial on the issue of whether the Poyzers were good faith encumbrancers for value. No other issues were raised or resolved in the earlier appeal and the question of the priority of the mortgages remained to be determined on remand. We conclude that the trial court did not err in permitting the Poyzers to raise other issues relating to priority.

The dispositive issue in this appeal is whether the trial court erred in determining that the senior mortgagee, Cargill, agreed to subordinate [1] its mortgage to the Poyzers' mortgages.

The trial court found:

"12. Discussions and negotiations were had between A.W. Poyzer and Cargill in 1981 about getting operating capital for ASGC and getting a loan in the amount of $75,000.00 to $100,000.00. Cargill was represented by Tom Geyser [Geisen] who was manager of the finance department covering five states. Cargill became concerned over the lack of operating capital beginning in late 1979. Geyser [sic] discussed the problem with A.W. Poyzer and also Peter Wasche, President of the Board of Directors. Cargill wanted ASGC to get a local loan

beginning in early 1980. ASGC hired a law firm to assist in getting a small business loan from the federal government in the amount of $400,000.00. About ten to twelve different lending agencies were contacted by ASGC in an attempt to get a loan. Geyser [sic] was made aware and constantly informed of the efforts to borrow money. He stated that if ASGC could find a lender, ASGC would necessarily have to give a real estate mortgage and 'we would not have any problem with it.' At no time was there any conversation in the context of Cargill having a mortgage on the off right-of-way property and the need for releasing such mortgage.

\* \* \* \* \* \*

"16. The loans of ASGC from the Plaintiffs in these two actions were pursuant to all agreements and negotiations between ASGC and Cargill in efforts to get working capital and to reduce the indebtedness to Cargill.

"17. Even though Cargill officers told A.W. Poyzer that there would be no problem in giving mortgages to the new lenders, and even though Cargill got all of the $90,000.00, it refused to recognize the two mortgages as having any validity. Cargill refused to subordinate its 'security agreement' to the two mortgages because of its newly founded position that it agreed to the new mortgage only on the seed plant portion of Block 4; and when it found that the entire Block 4 had been mortgaged, it became hostile and refused to release any portion of Block 4.

"18. This Court finds from the evidence that Cargill agreed with Poyzer and ASGC that Cargill would subordinate its lien on off railroad right-of-way land to any lender taking a mortgage on such real estate. This was pursuant to testimony of Geyser [sic] and A.W. Poyzer.

\* \* \* \* \* \*

---

1. A subordination agreement is defined as:
   "An agreement by which the subordinating party agrees that its interest in real property should have a lower priority than the interest to which it is being subordinated." Black's Law Dictionary 1279 (5th Ed.1979).

"22. This Court finds that Cargill agreed to allow the lenders [Poyzers] a first lien on all of Block 4 and that such agreement places the Plaintiffs' two mortgages with priority over any security or interest of Cargill in Block 4. Even though the agreement is verbal in nature, the agreement is still binding on Cargill on the theory of partial performance, unjust enrichment, equitable estoppel, and contract law."

Whether or not an oral contract exists is a question of fact. *Hirschkorn v. Severson*, 319 N.W.2d 475 (N.D.1982). Our review of findings of fact is governed by the clearly erroneous standard of N.D.R.Civ.P. 52(a). A finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *E.g., Heller v. Heller*, 367 N.W.2d 179 (N.D.1985). Where there are two permissible views or inferences to be drawn from the evidence, a trial court's choice between them cannot be clearly erroneous. *Owan v. Kindel*, 347 N.W.2d 577 (N.D.1984).

In this case, the evidence adduced at trial established that Cargill wanted ASGC to find outside sources of capital, and ASGC made contact with several potential local lenders to secure financing. A.W. testified that Thomas Geisen, the manager of Cargill's finance account department, had advised him that "from whatever source you were going to receive the money, that Amenia Seed could give a first lien on this property." During testimony by A.W. at trial, the following excerpt from his deposition was read into evidence:

"Q. Do you recall starting on page 19 when I asked the question, 'Did you discuss the note and mortgage with your mother?' Answer, 'Yes.' 'What did you talk about?' Answer, 'I indicated to my mother that Tom Geisen had offered alternatives as to reducing the amount of money owed to Cargill. Those alternatives were to use off railroad property, to use the mortgage to bring money into the corporation. And I indicated to her that a search was being made. Tom had indicated that probably the board of directors or probably the stockholders or whoever could put money into the corporation. There had been a considerable amount of time spent prior to that time in searching for those financing arrangements. She indicated that she would put some money in there if, you know, what collateral could she get. And I indicated to her that in a letter that Tom had written to us that we were supposed to go to Cargill—Casselton State Bank and seek long term financing using the mortgages that were given to her for financing.' 'What would Cargill do in return?' Answer, 'Cargill would release the mortgage. Any security agreement.' Do you remember that answer?

"A. Not at all but I guess I said it.

"Q. So you did indicate to your mother, at least you are indicating it on May 5th, 1983, that you had indicated to your mother that Cargill would release the mortgage?

"A. Well—

"Q. Yes or no?

"A. Yes."

■ We believe this evidence supports the inference that Cargill agreed to release whatever priority it had in the land if outside sources of capital, including loans from the Poyzers, were made available to ASGC. Based on this evidence, and after a careful review of the entire record, we are not left with a definite and firm conviction that the trial court erred in finding that Cargill agreed to subordinate its mortgage to the Poyzers' liens. Accordingly, we conclude that finding is not clearly erroneous under N.D.R.Civ.P. 52(a).[2]

Having reached that conclusion, we must also consider the relationship of the statute of frauds to the subordination agreement. N.D.C.C. § 9–06–04, provides, in part:

2. While we have concluded that that finding is not clearly erroneous, we note that Cargill did not challenge that finding in its brief to this court. In *Advanced Irrigation, Inc. v. First National Bank of Fargo*, 366 N.W.2d 783 (N.D. 1985), we said that findings of fact not challenged on appeal are presumed correct.

"*9–06–04. Contracts invalid unless in writing—Statute of frauds.* The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by his agent:

\* \* \* \* \* \*

"3. An agreement for the leasing for a longer period than one year, or for the sale, of real property, or of an interest therein. Such agreement, if made by an agent of the party sought to be charged, is invalid unless the authority of the agent is in writing subscribed by the party sought to be charged."

Part performance of an oral contract removes it from the statute of frauds. *E.g., Vasichek v. Thorsen,* 271 N.W.2d 555 (N.D. 1978). The part performance must be consistent only with the existence of the alleged contract. *Buettner v. Nostdahl,* 204 N.W.2d 187 (N.D.1973).

■ The trial court determined that the verbal agreement to subordinate was binding because of part performance. We agree. The evidence established that Cargill was eager for ASGC to find outside sources of capital. The Poyzers had a title opinion done on the land, and when that opinion did not disclose any prior mortgages, they loaned ASGC $90,000 which went to reduce its indebtedness to Cargill. There was evidence that the Poyzers would not have loaned the money had they not received a first mortgage. Thereafter, the Poyzers fully performed their part of the agreement by lending ASGC a total of $90,-000. We conclude that these facts constitute sufficient part performance consistent only with the oral subordination agreement to remove it from the operation of the statute of frauds.[3]

Because the trial court's decision is sustainable solely on the subordination issue, we need not address the issues of merger or good faith encumbrancers without notice.

The district court judgments are affirmed.

ERICKSTAD, C.J., and VANDE WALLE, GIERKE and MESCHKE, JJ., concur.

---

**3.** We note that it has been held that an oral subordination agreement is not within a statute of frauds similar to N.D.C.C. § 9–06–04(3). *North Georgia Savings & Loan Ass'n, Inc. v. Corbeil,* 177 Ga.App. 523, 339 S.E.2d 779 (1986); see also *Loewen v. Forsee,* 137 Mo. 29, 38 S.W. 712 (1897); 72 Am.Jur.2d, Statute of Frauds, § 83 (1974). Because we conclude in this case that there was sufficient part performance to remove the oral agreement from the statute of frauds, we need not decide whether the oral subordination agreement is an agreement required to be in writing by N.D.C.C. § 9–06–04(3).